STATE OF CONNECTICUT *v.* JOHN MOYE
(AC 30737)

Lavine, Beach and Pellegrino, Js.

---

Argued November 17, 2009—officially released February 2, 2010

*Kent Drager,* senior assistant public defender, for the appellant (defendant).

*Susann E. Gill,* supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *Jonathan C. Benedict,* former state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, John Moye, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of General Statutes § 29-35 (a) and, after his plea of guilty under the *Alford* doctrine,[1] of criminal possession of a pistol in violation of General Statutes § 53a-217c (a) (1). On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction of murder, (2) the court improperly instructed the jury on the murder charge, (3) the prosecutor committed reversible impropriety during the defendant's testimony and (4) the court improperly canvassed the defendant with regard

[1] *North Carolina* v. *Alford,* 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

to his *Alford* plea to the charge of criminal possession of a pistol. We affirm the defendant's conviction of murder and carrying a pistol without a permit. We reverse, however, the defendant's conviction of criminal possession of a pistol.

The following facts, which the jury reasonably could have found, are relevant to the defendant's appeal. On the evening of April 30, 2005, after Clarence Jones, the victim, asked him for a ride, Jerry Booker picked up Jones, Roderick Coleman and the defendant. The group briefly stopped at Booker's house in West Haven and then proceeded to the Ebony Lounge in New Haven. Coleman and the defendant went inside for approximately fifteen minutes, while Booker and the victim waited in the car. When Coleman and the defendant returned to the car, Coleman asked Booker to drive to the Pleasant Moments Cafe in Bridgeport, where his girlfriend worked as a dancer.

Upon arriving at Pleasant Moments Cafe, Booker, Coleman and the victim entered the club while the defendant stayed in the car. The three men who went inside the club were searched for weapons before they were allowed to enter. When Pleasant Moments Cafe closed for the night, Booker, Coleman and the victim emerged from the club with Tamara Wilson, Coleman's girlfriend, Tawana Little and a third woman by the name of Jada. They all got into Booker's car. Booker was the driver, the victim and Jada rode in the front passenger seat, the defendant sat behind Booker, Little was seated next to him, and Wilson sat on Coleman's lap behind the front passenger's seat.

Booker next drove to a nearby gasoline station. Booker, the victim and Jada got out of the car and entered the gasoline station. With the two men and Jada out of the car, the defendant began telling the other passengers about his belief that Booker and the victim

planned to rob him. He said that he was going to "act up." Those who went into the gasoline station returned to the car, and the group left the gasoline station to drop off Jada.

As Booker was driving to Jada's house, his cellular telephone rang. He answered the telephone and handed it to the victim when he realized that it was the victim's mother calling. Then a loud bang came from the backseat. The victim's mother heard someone say: "Call 911. He's been shot." The defendant, holding a gun, ordered everyone to get out of the car. Booker and Jada got out of the car, the defendant got into the driver's seat, pushed the victim's body out of the car and drove away.

After driving a short distance, the defendant stopped the car, wiped down the steering wheel and car handles, and exited the car with Little, Wilson and Coleman. The group got into a taxicab and went to Little's house in New Haven. Once at Little's house, the defendant again told the others that he believed that he was going to be robbed and that was why he shot the victim. He told Little that he had tried to shoot the victim in the face and also told Little and Wilson that they should "take it to the grave."

The defendant was arrested on May 20, 2005. He was found in a house in Stamford, lying across the seats of several chairs under a dining room table. The defendant was charged with murder, carrying a pistol without a permit and criminal possession of a pistol. He was found guilty of murder and carrying a pistol without a permit, and entered an *Alford* plea with regard to the criminal possession of a pistol charge. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim on appeal is that there was insufficient evidence to support the jury's guilty

verdict as to the murder conviction. Specifically, he argues that the evidence was insufficient to prove that he intentionally caused the victim's death.[2] We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State v. Ovechka*, 292 Conn. 533, 540–41, 975 A.2d 1 (2009), after remand, 118 Conn. App. 733, 984 A.2d 796 (2010).

"To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person . . . cause[d] the death of such person or of a third person . . . . [T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim.

[2] The defendant contends that "there was insufficient evidence to prove beyond a reasonably doubt that [he] acted with the specific intent (conscious objective) to kill [the victim], or that he caused the death by shooting, or that the death of [the victim] was not an accident." Although the defendant makes three arguments regarding his insufficient evidence claim, the arguments are essentially identical, so we will address only the argument that there was insufficient evidence to prove that the defendant intentionally caused the victim's death.

. . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill. . . . Our law also provides that the defendant's state of mind at the time of the shooting may be proven by his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 107 Conn. App. 209, 217–18, 944 A.2d 994, cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

Our Supreme Court has stated that a person "who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 259, 681 A.2d 922 (1996). Here, the defendant, seated in the backseat of a car, shot the victim, seated in the front passenger's seat, in the head.[3] Although the defendant testified that the gun went off

---

[3] There was expert testimony that the entry wound was on the left side of the victim's face, in front of his ear, which is consistent with the positioning of the defendant and the victim in the car. Furthermore, the expert witness testified that the wound was consistent with the gun being fired while in contact with, but not pressed tightly against, the victim's face.

accidentally as he struggled with the victim for its control, no other witness testified about such a struggle. Additionally, there was testimony from one of the witnesses that the defendant stated that he had tried to shoot the victim in the face. The defendant's use of a gun coupled with his later statement, in light of all the circumstances, was sufficient evidence for the jury to conclude that the defendant had the conscious objective to cause the death of the victim.

Furthermore, the defendant's actions following the shooting are indicative of a consciousness of guilt. "A trial court may admit [e]vidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, [which] is ordinarily the basis for a charge on the inference of consciousness of guilt. . . . In seeking to introduce evidence of a defendant's consciousness of guilt, [i]t is relevant to show the conduct of an accused . . . as well as any statement made by him subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act." (Internal quotation marks omitted.) *State* v. *Pascal*, 109 Conn. App. 55, 72, 950 A.2d 566, cert. denied, 289 Conn. 917, 957 A.2d 880 (2008). The jury heard testimony from witnesses that the defendant wiped down the steering wheel and car door handles before fleeing the scene of the crime, threatened witnesses by telling them to "take it to the grave" and was found by police hiding by lying on the seats of several chairs under a table. Taken together, the consciousness of guilt evidence in combination with the defendant's use of a deadly weapon provided sufficient evidence for the jury to find that the defendant intended to cause the victim's death.

## II

The defendant's next claim is that the court improperly instructed the jury regarding the intent aspect of

the murder charge. The defendant argues that the court erred by (1) failing to instruct the jury that the state had the burden of proving beyond a reasonable doubt that the victim's death was caused by an intentional killing and not by accident and (2) not incorporating within its charge to the jury the defendant's requested language regarding intentional conduct.[4] We disagree.

The following facts are pertinent to the defendant's claim. On the basis of the defendant's theory of defense that the gun accidentally discharged, the defendant requested that the court instruct the jury as follows: "Intentional conduct is purposeful conduct, rather than conduct that is accidental or inadvertent,[5] *and my instruction on this point is particularly applicable to this case because it is the defendant's claim in this*

---

[4] The defendant frames this as a four argument claim. He contends that "the court erred in its instructions on intentional murder: (A) by not instructing that the state had the burden of proving beyond [a] reasonable doubt that the death of [the victim] was caused by killing rather than accident, (B) by not instructing, as properly requested, on the defense theory that [the victim's] death was an accident, (C) by not instructing, as properly requested, with [the] standard language, 'intentional conduct is purposeful conduct, rather than conduct that is accidental or inadvertent,' and/or (D) by mistakenly informing defense counsel [that] the court would instruct with the standard language 'intentional conduct is purposeful conduct, rather than conduct that is accidental or inadvertent' so [that] defense counsel was misled to refer to the judge so instructing in his final jury argument to the prejudice of [the] defendant."

Although the defendant sets forth four arguments, his brief only analyzes the claim in the two discrete ways set forth in the statement of the claim. While we acknowledge that the defendant's fourth argument introduces a different legal theory, he does not provide any analysis in his brief that differentiates this argument from the others. Furthermore, were we to address this argument, we note that the charging conference in which the court allegedly informed defense counsel that it would "instruct with the standard language" was held off the record. Therefore, the record is not adequate to review that argument. *State* v. *Rodriguez*, 60 Conn. App. 398, 399 n.1, 759 A.2d 123 (2000), cert. denied, 255 Conn. 928, 767 A.2d 103 (2001); see also *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Thus, we will address this claim as set forth in the statement of the claim.

[5] This language is quoted from D. Borden & L. Orland, 5A Connecticut Practice Series: Criminal Jury Instructions (3d Ed. 2001) § 7.1, p. 1.

*case that [the victim's] death was the result of a tragic accident, rather than any specific intention on the defendant's part to cause [the victim's] death. If, in this case, you find that [the victim's] death was accidental, then you cannot convict [the defendant] of the offense of murder.*" (Emphasis in original.) In the defendant's closing argument, he argued that the state had failed to prove intent because it had not disproved that the shooting was accidental: "This was an accident. A very, very tragic accident, pure and simple. And the judge is going to tell you, you know, when he charges you on the law. He's going to talk about intent. And I believe he's going to say something like, you know, intentional conduct has to be purposeful conduct. It cannot be conduct that is accidental or inadvertent. If it's accidental, it's not intentional; the state loses here."

In its charge to the jury, the court instructed on intent but did not incorporate the language requested by the defendant. Following the jury charge, defense counsel objected to the court's failing to give the requested instruction not only because he had told the jury that such a charge would be given, but also because he believed that the court had agreed to give such a charge.[6] The court noted the objection but determined that it would not add the requested language to the intent instruction.

We begin by setting forth the standard of review. "A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Internal quotation marks omitted.) *Mann* v. *Regan*, 108 Conn. App. 566, 576, 948 A.2d 1075 (2008). "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context

---

[6] The state also took exception to the intent instruction because the court failed to give a requested instruction about drawing an inference of intent to kill based on the type of weapon used and the manner in which it was used.

of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 452–53, 978 A.2d 1089 (2009).

A

The defendant first argues that the court mistakenly failed to instruct the jury that the state had the burden of proving beyond a reasonable doubt that the victim's death was the result of an intentional killing, not an accident. He contends that because he asserted that the shooting occurred by accident, the state was required to disprove the theory beyond a reasonable doubt, and because the court did not so instruct, the jury may have been under the impression that the defendant had the burden of proving its theory of accident. Because a claim of accident is not a defense but merely negates the intent element of the crime, we disagree with the defendant's contention that the court had to charge explicitly that the jury could not convict the defendant unless the state proved, beyond a reasonable doubt, that the death was not an accident.

"Accident is not a justification for a crime . . . it negates only one element of the crime, namely, intent."

(Citation omitted.) *State* v. *Schultz*, 100 Conn. App. 709, 716, 921 A.2d 595, cert. denied, 282 Conn. 926, 926 A.2d 668 (2007). "A claim of accident, pursuant to which the defendant asserts that the state failed to prove the intent element of a criminal offense, does not require a separate jury instruction because the court's instruction on the intent required to commit the underlying crime is sufficient in such circumstances." *State* v. *Singleton*, 292 Conn. 734, 752, 974 A.2d 679 (2009).

The defendant admitted that he shot and killed the victim. The jury was left to determine whether the defendant intended to kill the victim, or whether it believed the defendant's testimony that the gun discharged after a struggle. When defining intent, the court made clear in its instruction that if it was the conscious objective of the defendant to cause the result, namely, the death of the victim, then he acted with the requisite intent, but if the jury failed to find the requisite intent beyond a reasonable doubt, then the defendant must be found not guilty. Given the court's instructions, it necessarily follows that the jury logically could not have found both that the defendant acted with the specific intent to cause the victim's death and that he did not intend to inflict such injury.

B

The defendant's second argument regarding the court's jury instruction is that the court erred in not incorporating his requested language that "[i]ntentional conduct is purposeful conduct, rather than conduct that is accidental or inadvertent," within its charge to the jury. We disagree.

"The trial court is not under a duty in a criminal proceeding to charge in the identical language requested if the charge [given to the jury] is accurate, adequate and, in substance, properly includes material portions of the defendant's request; its responsibility is

performed when it gives instructions to the jury in a manner calculated to give them a clear understanding of the issues presented for their consideration, under the offenses charged and upon the evidence, and when its instructions are suited to their guidance in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Beliveau*, 36 Conn. App. 228, 246–47, 650 A.2d 591 (1994), aff'd, 237 Conn. 576, 678 A.2d 924 (1996). "Although [a] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given . . . [a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance. . . . Thus, when the substance of the requested instructions is fairly and substantially included in the trial court's jury charge, the trial court may properly refuse to give such instructions." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 22, 818 A.2d 1 (2003).

Although the court did not incorporate the requested language, the substance of the defendant's instruction was included in the actual jury charge. The court instructed the jury that for a person to act intentionally with respect to a result, it must be his conscious objective to cause that result.[7] The court also explained that the jury need not infer the defendant's intent from his conduct if, based on the testimony it had heard, it was not a reasonable and logical inference. Finally, the court was clear that the state had the burden to prove the defendant's intent beyond a reasonable doubt. The court's charge did not specifically address the defendant's claim that the shooting was accidental, but the court gave instructions in a manner calculated to give

---

[7] In its jury charge, the court stated: "Now, as defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause the result." The court later reiterated that "[o]ur statutes—as I've already indicated but it is worth repeating, our statute provides that, a person acts intentionally with respect to a result when his conscious objective is to cause such result."

the jury a clear understanding of the issues presented for its consideration, under the offenses charged and upon the evidence and suited to its guidance in the determination of those issues. See *State* v. *Beliveau*, supra, 36 Conn. App. 246–47. Although the giving of the requested instruction might assist the jury in an appropriate case, we conclude that the failure to give it was not improper in this case.

### III

The defendant next claims that, during defense counsel's direct examination of the defendant, the prosecutor committed impropriety that is grounds for reversal. Specifically, the defendant maintains that, when objecting to a question posed by defense counsel, the prosecutor improperly implied, in front of the jury, that the defendant either had additional convictions for violent crimes or had the character or propensity to commit violent acts. Without deciding whether the prosecutor's objection constituted an impropriety, we conclude that it did not so infect the trial with unfairness so as to deprive the defendant of his due process right to a fair trial, as contemplated by *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987).

The following additional facts are relevant to the resolution of the defendant's claim. During defense counsel's direct examination of the defendant, defense counsel asked the defendant whether he had any past felony convictions on his criminal record. The defendant testified that he had four felony convictions, one of which was attempt to commit assault on a police officer, which resulted from the defendant's throwing a rock at a police car. Defense counsel followed up by asking if the defendant had ever been convicted of any "violent offenses . . . ." The defendant responded that he had not, at which point the state objected, leading to the following discussion:

"[The Prosecutor]: Your Honor, I'm going to object. This is—this is improper. If he's trying to bring out something that goes to credibility, this is turning into some sort of [an] offer, which is to show his propensity for violence. I—I'm sure [defense counsel] does [not] want to go down that road, Your Honor.

"The Court: [Defense counsel]—

"[Defense Counsel]: Well, I—I want to object to that last statement.

"The Court:—are you claiming the question?

"[Defense Counsel]: But it is certainly a road that I—I want to go down.

"The Court: The objection as to the question you've asked is sustained. Next question."

The defense counsel next asked the defendant if he had been convicted of any offenses involving dishonesty and then again asked about violent offenses. The state again objected:

"[The Prosecutor]:—I'm going to object. What was he—

"[Defense Counsel]: I didn't finish my question, Your Honor.

"[The Prosecutor]: Your Honor, this is not—because this is prejudicial. This is what my objection was. He's asking what would—what would—could possibly be? Have you ever been convicted of any violent offenses? If the offer is—is—if he's trying to say what? If he's trying to open up the door, Your Honor, for—to show that he has a good character or a peaceable character, I want to be clear because if he's offering—

"[Defense Counsel]: That's not—

"[The Prosecutor]: Well, then what is the claim because—because if it's what's the difference is it's a— if it's a felony conviction. It's felony conviction and that's what goes to credibility. That's what the charge will be. If he's trying to distinguish, but [the defendant] you haven't been convicted of any—any—any charges relating to violence, and he's going to claim—I will then offer evidence on that issue. And I don't think [defense counsel's] going to be happy with it. So, I would say that we should—we should establish that now, Your Honor."

After the court excused the jury from the courtroom, defense counsel moved for a mistrial. He argued that the prosecutor talked about offering evidence of a violent character in front of the jury. The prosecutor explained that he was objecting to what he believed was an attempt by defense counsel to get evidence of the defendant's character before the jury without allowing the prosecutor to respond on cross-examination. In denying the motion for a mistrial, the court reprimanded the prosecutor, telling him that his comment about the defendant not being happy if they were to "go down that road" was "unnecessary . . . ."

"The governing legal principles on prosecutorial impropriety are well established. [A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams,* [supra, 204 Conn. 535–40]. . . . [T]he touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in . . . *Williams.* . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that

impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . .

"If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in . . . *Williams* . . . whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair trial. . . . These factors include the extent to which the impropriety was invited by defense conduct, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case. . . . We address the alleged improprieties in turn." (Citations omitted; internal quotation marks omitted.) *State* v. *Jordan*, 117 Conn. App. 160, 162–64, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009).

Assuming, but without concluding, that an impropriety in fact occurred, we will examine the effect that such an impropriety might have had on the defendant's due process right to a fair trial. The first *Williams* factor considers the extent to which the impropriety was invited by defense conduct. The defendant argues that because there was no defense misconduct, the impropriety could not have been invited by the defendant. The state counters that the prosecutor's remarks were made in response to the defendant's attempts to introduce character evidence under the guise of credibility, thus not allowing the state to rebut the evidence. Although it is true that the prosecutor's comments were made only after defense counsel questioned the defendant, the prosecutor could have registered his objection with the court without making the statements that he made.[8] We agree with the court's assessment that the challenged remark was unnecessary.

---

[8] "Our cases indicate that improper unsworn testimony generally contains the suggestion of secret knowledge . . . on the part of the prosecutor. [In

With regard to the second, third and fourth *Williams* factors, the defendant concedes that the claimed impropriety was not repeated but argues that it was severe because it went to the heart of the trial—the defendant's character and credibility. The state contends that the comment was not severe because the central issue of the case was not the defendant's character and credibility but, rather, his intent. We agree with the state's characterization of the main issue at trial and also its contention that the impropriety was not severe.

The fifth *Williams* factor contemplates the effectiveness of the curative measures adopted by the court. Here, after the court denied the defendant's motion for a mistrial, it did not take any curative measures in front of the jury. The defendant now argues that that was because the defense counsel did not realize the "prejudicial nature of the prosecutor's impropriety . . . ." The state maintains that defense counsel's failure to request that the court give a curative instruction may have been a tactical decision not to highlight the remark. We agree with the state that this lack of curative measures is attributable directly to the defendant's failure to request a curative instruction. The defendant bears much of the responsibility for the fact that these claimed improprieties went uncured. "The failure by the defendant to request specific curative instructions frequently indicates on appellate review that the challenged instruction did not deprive the defendant of a fair trial."

*Holliday*], the prosecutor's statement merely was an explanation of the ground for his objection and not an indication that he possessed secret knowledge of relevant facts. . . . [T]he proper course of action would be for the prosecutor simply to state the grounds upon which [the] objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had . . . [a]rgument upon such objection . . . arising during the trial of a case shall not be made by either party unless the judicial authority requests it . . . . Practice Book § 5-5." (Citations omitted; internal quotation marks omitted.) *State* v. *Holliday*, 85 Conn. App. 242, 260, 856 A.2d 1041, cert. denied, 271 Conn. 945, 861 A.2d 1178 (2004).

(Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 291, 973 A.2d 1207 (2009).

The final *Williams* factor, the strength of the state's case, also favors the state. As discussed previously, although the defendant testified that the gun went off accidentally during a struggle with the victim, several witnesses testified that they saw the defendant shoot the victim without any struggle having taken place and were threatened to "take it to [their] grave[s]." Little testified that the defendant told her that he was trying to shoot the victim in the face. We conclude that any impropriety that may have occurred did not "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539.

IV

The defendant's final claim is that the court improperly canvassed him with regard to his *Alford* plea to the charge of criminal possession of a pistol in the part B information. He argues that the court failed to comply with the due process requirements for the acceptance of a guilty plea because it did not explicitly canvass him on the three core constitutional rights he waived by pleading guilty.[9] We agree with the defendant and reverse his conviction of criminal possession of a pistol.

The following facts are relevant to the defendant's claim. Once the jury returned the guilty verdict as to the charges of murder and carrying a pistol without a permit, the jury was excused. At that time, and after conferring with counsel, the defendant entered an *Alford* plea on the criminal possession of a pistol

[9] The defendant also argued that his conviction cannot stand because the court canvassed him on the crime of criminal possession of a firearm rather than criminal possession of a pistol. Because we decide this claim on the basis of the defendant's first argument, we need not address this contention.

charge. The court then canvassed the defendant as follows:

"The Court: Have you had enough time to speak with your attorney about entering a guilty plea to the third count of the information, which is a part B information, of criminal possession of a firearm?

"[The Defendant]: Yes, sir.

"The Court: Do you need any more time to speak with your attorney?

"[The Defendant]: No, sir.

"The Court: Are you satisfied with [the] legal representation of you?

"[The Defendant]: Yes, sir.

"The Court: And are you under the influence of anything at all, alcohol, drugs or medication?

"[The Defendant]: No, sir.

"The Court: Have you been forced or threatened by anyone to plead guilty?

"[The Defendant]: No, sir. . . .

"The Court: Okay, no one's threatening you or forcing you to enter a guilty plea?

"[The Defendant]: No, sir.

"The Court: And you are not being promised anything in exchange for your guilty plea?

"[The Defendant]: No, sir. . . .

"The Court: Now, one more thing that I didn't ask you, sir; you understand that this is a class B felony with a mandatory minimum of two years that would be added to any sentence to be imposed at the time of sentencing; are you aware of that?

"[The Defendant]: Yes, sir.

"The Court: Do you have any questions?

"[The Defendant]: No, sir."

The court then found that there was a factual basis for the plea and that the plea was entered knowingly, intelligently and voluntarily.

"It is axiomatic that unless a plea of guilty is made knowingly and voluntarily, it has been obtained in violation of due process and is therefore voidable. . . . A plea of guilty is, in effect, a conviction, the equivalent of a guilty verdict by a jury. . . . In choosing to plead guilty, the defendant is waiving several constitutional rights, including his privilege against self-incrimination, his right to trial by jury, and his right to confront his accusers. . . . These considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . . We therefore require the record affirmatively to disclose that the defendant's choice was made intelligently and voluntarily." (Internal quotation marks omitted.) *State* v. *Heyliger*, 114 Conn. App. 193, 196–97, 969 A.2d 194 (2009).

"The United States Supreme Court has held that for the acceptance of a guilty plea to comport with due process, the plea must be voluntarily and knowingly entered. *Boykin* v. *Alabama*, 395 U.S. 238, 243–44, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). *Boykin* set forth three federal constitutional rights of which a defendant must be cognizant prior to entering a guilty plea: (1) the privilege against compulsory self-incrimination; (2) the right to trial by jury; and (3) the right to confront one's own accusers." (Internal quotation marks omitted.) *State* v. *Wheatland*, 93 Conn. App. 232, 236, 888 A.2d 1098, 888 A.2d 1098, cert. denied, 277 Conn. 919,

895 A.2d 793 (2006). "Moreover, [t]he constitutional stricture that a plea of guilty must be made knowingly and voluntarily . . . requires . . . that there be a voluntary waiver during a plea canvass of the right to a jury trial, the right of confrontation and the right against self-incrimination . . . ." (Internal quotation marks omitted.) *State* v. *Heyliger*, supra, 114 Conn. App. 197.

The court, during its canvass of the defendant, failed to inform him and to obtain a waiver of any of the three constitutional rights discussed in *Boykin*. Without a record indicating that the defendant understood those rights and voluntarily waived them, the conviction of criminal possession of a pistol cannot stand. See *State* v. *Brooks*, 82 Conn. App. 93, 94, 842 A.2d 631 (2004).

The judgment is reversed only as to the conviction of criminal possession of a pistol and the case is remanded for further proceedings according to law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.