******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LUIS SANCHEZ
(AC 38310)

DiPentima, C. J., and Sheldon and Mullins, Js.

*Argued March 14—officially released July 5, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Mullarkey, J.)

*Susan M. Hankins*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. Following a jury trial, the defendant, Luis Sanchez, was convicted of one count of murder in violation of General Statutes § 53a-54a and two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5). On appeal, the defendant claims that the trial court erred in (1) admitting, as proof of intent, prior misconduct evidence regarding his involvement in a shooting that had occurred fifteen months before the charged crimes, in which he used the same gun that he used in the charged crimes, and (2) charging the jury that this misconduct evidence was admitted to prove the intent elements of the charged crimes.[1] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of October 6, 2010, the defendant, his half-brother Justin Bonilla, and his friends Gina Colon, Santos Gonzalez, Gabriel Rivera, and Akeem Wilis attended an "open mic" night at the Franklin Bar and Grill (bar) on the corner of Franklin Avenue and Brown Street in Hartford. Gonzalez drove the group to the bar in his car.

At the bar's entrance, an individual employed by the event's organizer to provide security patted down male patrons to make sure that no one entered with a weapon. Prior to entering the bar, the defendant concealed a gun under the driver's seat of Gonzalez' car.

In the early morning hours of October 7, 2010, someone jostled or spilled a drink on a female patron, precipitating a disturbance near the bar's stage. Bobby Forbes and Joseph Schroeter were onstage with the performer when the disturbance began. Shortly after that disturbance, a fight broke out elsewhere in the bar. At the start of the fight, the defendant, Bonilla, and Wilis left the bar via the Brown Street exit. As the defendant left the bar, a security guard, Quron Zene, heard the defendant say "somebody get a ratchet."[2] After exiting the bar, the defendant retrieved his gun from Gonzalez' car.

After the physical fighting broke out, the bar's owner began ushering patrons to the exits. Before being ejected from the bar, Forbes put an empty beer bottle in the pocket of his red and black jacket.[3] As patrons exited the bar, they congregated at the corner of Franklin Avenue and Brown Street.

The defendant calmly walked from Gonzalez' car to a position in front of a bank across the street from the bar. From there, he fired gunshots into the crowd. He fired an initial volley of shots into the crowd, then paused before firing a second volley of shots in the same direction. In all, he fired twelve shots into the assembled crowd in the two separate bursts. The defendant's gunfire struck Jeanna Flores, who was standing in the crowd, in the back of the head, causing her

death. The defendant's gunfire also struck Forbes and Schroeter, causing them injuries.[4]

After the shooting, the defendant and his companions fled the scene in Gonzalez' car. As the group drove away, the defendant asked Wilis if he had seen "the way [the defendant] let them have it" and told Wilis that he "had to do it." The following afternoon, the defendant and Colon fabricated an alibi according to which the defendant and Wilis left the bar with some women before the disturbance began.

The defendant and Colon also asked Colon's cousin, Aida Rojas, to corroborate their false alibi by telling the police, if they questioned her, that the defendant had spent the night at her house. A few weeks later, Rojas drove Colon and the defendant to the riverfront in Hartford, where the defendant threw the gun he had used in the shooting into the river.

Sometime thereafter, the police questioned Rojas. Rojas initially gave police the false alibi that the defendant was not at the bar, but rather had spent the night at her house. The defendant also gave the police the false alibi, telling them that he had left the bar before any disturbance and had spent the night at Rojas' house. Rojas later admitted to the police that the alibi was a lie.

The police also questioned Colon. Colon gave the police two different and contradictory statements regarding the shooting outside the bar. When questioned initially, she did not mention that the defendant was present, in keeping with the fabricated alibi. Later, after having been charged with tampering with a witness and hindering prosecution for having solicited Rojas to lie, Colon divulged that on the day after the shooting the defendant told her that "someone pulled out a gun and he had to do what he had to do" because otherwise someone could have been shot, and "it could have been [Colon]."

The following procedural history is also relevant. On October 26, 2011, after the state had convened a grand jury to investigate the events of October 6-7, 2010, Michael Sullivan, an inspector in the cold case unit of the Chief State's Attorney's Office, informed the defendant that he was the target of the investigation. Sullivan told the defendant that he had a right to testify before the grand jury. The defendant denied knowledge of or involvement in the shooting. In response, Sullivan remarked that "there's a lot of ways that people die in a shooting that is not necessarily murder," including when you shoot at someone else in order to protect yourself. The defendant maintained that he had nothing to do with a murder.

Prior to the start of trial, the state filed notice of its intent to offer prior misconduct evidence. Specifically, the state sought to offer evidence that in 2009, an individual named Fred Colby[5] had identified the defendant

as one of two individuals who had threatened him with automatic handguns, then fired at him as he fled the scene in his vehicle. The state represented that a 9mm shell casing recovered from the scene of the 2009 incident matched the casings recovered in the present case, thereby establishing that they had been fired from the same gun. The state sought admission of the evidence on two separate bases: (1) as relevant to the defendant's intent to commit murder and assault; and (2) as evidence of the defendant's identity as the shooter because it demonstrated that he possessed the instrumentality or means to commit these crimes.

On September 12, 2013, the court heard argument from the parties as to whether it should admit evidence of the 2009 incident, at the conclusion of which it reserved decision on the matter. On October 10, 2013, the court heard additional argument and preliminarily ruled that the evidence was admissible.

On October 21, 2013, the fifth day of the defendant's trial, the court heard testimony outside the presence of the jury from Megan Pytlik, a lab technician who had matched the shell casing from the 2009 incident to the casings recovered in the present case, and from Pytlik's supervisor, James Stephenson, who verified the results of Pytlik's examination. Afterward, the court ruled that the evidence of the defendant's involvement in the prior shooting was admissible.[6]

The jury subsequently heard testimony regarding the 2009 incident from three witnesses: Colby; Luis Raimundi, an officer in the Hartford Police Department; and Pytlik. Colby testified that in June, 2009, in the area of Bond Street in Hartford, he had an exchange with two individuals, both of whom were carrying guns. Colby testified that he fled from the two individuals to his car, and, as he was driving away, they fired shots at him, hitting the car's back windshield. Approximately one year later, when presented with a photographic array by the police, Colby identified the defendant as one of the shooters. When, at some point thereafter, Colby encountered the defendant in person, the defendant offered him "a couple grand if I just come plead the fifth," and told him to "keep it in the streets." After the conclusion of Colby's testimony, the court provided a limiting instruction to the jury.[7]

Raimundi then testified that in June, 2009, he had located Colby when following up on a call that a motorist had struck a pedestrian and attempted to evade responsibility. Upon locating Colby's car, Raimundi noted that its rear windshield was shattered. Raimundi and his partner also recovered three bullet fragments and one 9mm Luger shell casing in the vicinity of Bond Street.

Finally, Pytlik testified that the same gun had fired the shell casing recovered from the scene of the 2009

incident and the casings recovered in the present case. At the conclusion of Pytlik's testimony, the state rested its case-in-chief, and the court gave the jury another limiting instruction.[8]

The defendant elected to testify at trial. On the witness stand, he admitted that he had fired the shots that killed Flores and wounded Forbes and Schroeter. He then claimed, for the first time, that he had acted in defense of his friends. He testified that he heard an unidentified individual on the bar's stage say that he was going to get his gun from a car. In response to hearing that, he retrieved his own gun from Gonzalez' car.

The defendant testified that after he had retrieved his gun, he saw members of the crowd that had gathered on the corner of Franklin Avenue and Brown Street arguing with his friends, who were standing in front of the bar's Brown Street exit. He became nervous when he saw a man standing on the corner wearing a black jacket with red lettering pull a revolver from his pants. The defendant claimed that he saw that man aim his revolver at Colon and Bonilla. As a result, the defendant testified, he fired at the man to protect his friends.[9] Initially, he testified that his gun was an automatic, and its whole clip emptied at once, but, on cross-examination, he conceded that footage from the bank's surveillance camera showed him firing some shots, pausing, and then firing more shots as he backed away. He testified that he hit the man aiming at Colon and Bonilla, who fell to the ground and must have dropped his gun.[10] He testified that he later disposed of his own gun by throwing it into the river.

According to the defendant, he initially fabricated an alibi because he feared that the police would not believe that he had acted in defense of his friends. The defendant denied that Sullivan had mentioned self-defense, testifying that if Sullivan had done so, the defendant would have seized the opportunity to begin telling people that he had acted in defense of his friends. During the state's rebuttal case, the state played for the jury a recording of Sullivan's interview of the defendant, in which Sullivan told the defendant that "there's a lot of ways that people die in a shooting that is not necessarily murder," including when you shoot at someone else in order to protect yourself.

More specifically, in the interview, Sullivan told the defendant that "[a]ll I know is what the people tell us, they put a gun in your hand and you're shooting and a girl dies. Now in my eyes that's murder, unless there's an explanation. You know, if somebody else had a gun say, on the corner, and you were shooting at them to protect yourself, that's not necessarily murder, you know what I'm saying, there's a lot of different versions of events that influence what the charge would be. That's why we give you an opportunity to explain it,

but that's your choice."

In its final charge to the jury, the court gave another instruction as to the permissible use of evidence of the defendant's prior misconduct.[11] Thereafter, the jury rejected the defendant's justification of defense of others and found the defendant guilty of all charges. The court subsequently sentenced the defendant to a total effective term of sixty-five years imprisonment. This appeal followed. Additional facts will be provided as necessary.

On appeal, the defendant claims that "the trial court erred in admitting as substantive proof of intent, in a case where intent was the sole disputed issue, extrinsic misconduct evidence that fifteen months before the charged incident, the defendant shot at state's witness Fred Colby using a gun that was a ballistic match to the weapon the defendant used in the charged crimes, and . . . in charging the jury that this misconduct was admitted to prove the intent elements of the charged crimes . . . ."

The state counters that the court properly exercised its discretion in determining that the prior misconduct evidence was admissible as proof of intent. The state also argues that even if the admission of the evidence was an abuse of discretion, the court's error was harmless because there was ample evidence both to prove intent and to disprove the defendant's justification defense, and, therefore, the admission of the prior misconduct evidence did not substantially affect the verdict. We agree with the state that any error as to the admission or giving of limiting instructions concerning the evidence was harmless.

"We begin our review of the trial court's action by noting that [a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. Conn. Code Evid. § 4-5 (b). Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. . . .

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing

process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 659–61, 835 A.2d 895 (2003).

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . As we have recently noted, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 641–42, 930 A.2d 628 (2007).

The defendant advances several arguments in support of his claim that evidence of the 2009 shooting was inadmissible to prove that he intended to cause death or physical injury when he fired into the crowd gathered outside the bar in 2010. First, he argues that "firing a gun, even firing the same gun fifteen months earlier" was irrelevant to his mental state at the time of the charged crimes. Second, he contends that the probative value of the evidence was low because "the 2009 Bond Street incident and the charged 2010 offense[s] were unrelated in any way, other than through ballistics . . . ." Third, he argues that the prejudicial effect of the evidence was high because the prior misconduct and charged offenses were similar, putting pressure on jurors to infer that if he committed the earlier act, he had a predisposition to commit the latter. Finally, he argues that the prejudicial effect of the evidence was compounded because the evidence "showed . . . the defendant attacking another allegedly unarmed person, not defending himself or others." (Emphasis omitted.)

After reviewing the trial record and the parties' arguments on appeal, we conclude that even if we were to assume that the court abused its discretion by allowing the jury to consider evidence of the defendant's prior misconduct as to the issue of intent, any error was harmless. In light of the admission of the evidence in question on an independent, unchallenged basis and the strength of the state's case against the defendant, we can be "fair[ly] assur[ed]" that the error did not

substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Jacobson*, supra, 283 Conn. 641.

As an initial matter, with respect to the admission of the prior misconduct evidence itself, we must note that the court admitted the evidence not only under the intent exception, but also on the basis that it demonstrated the defendant's possession of the instrumentality of the charged crimes, which was relevant to establishing his identity as the shooter. The defendant has not challenged the propriety of the court's admission of the evidence on this separate basis. Accordingly, even if the admission of the evidence to prove intent was improper, there is no claim that the prior misconduct evidence was not properly before the jury on the issue of identity. See *State* v. *Merriam*, supra, 264 Conn. 667–68 (improper admission of prior misconduct evidence to prove identity was harmless error because "that evidence was properly before the jury, albeit under [the common plan or scheme] exception to the general rule against the admission of prior misconduct evidence"). Because the defendant failed to challenge the court's admission of this evidence as proof of his access to the instrumentality of the crime or its instruction permitting the jury to consider this evidence as it related to the defendant's possession of the instrumentality of the crime, any improper admission of this evidence also to prove intent was harmless.

The defendant also claims that the court committed harmful error in its limiting instructions and final charge to the jury permitting it to consider the prior misconduct evidence as proof of intent. He argues that "because the basis of admissibility (intent) was the foundational error in this case, the court's instruction was the problem, not the cure." He further argues that no instruction that permitted the jury to use the evidence as proof of intent would have been curative because "to use the [2009] misconduct to prove the 2010 intent . . . without resorting to character inferences, is clearly beyond the ability of anyone, let alone a juror faced with the court's confused directive." We disagree.

Here, the defendant has not established that the trial court's instructions permitting the jury to consider the prior misconduct evidence to establish his intent substantially affected the jury's verdict. On the contrary, there was ample evidence, apart from the challenged prior misconduct evidence and the court's accompanying instructions, to support the jury's guilty verdict, both in the form of evidence that the defendant possessed the requisite intent to cause death or physical injury when he fired a series of shots at the crowd of people on the corner outside the bar and in the form of evidence to undermine the credibility of the defendant's justification of defense of others.

"Intent is typically established by circumstantial evidence. . . . Such circumstantial evidence may include

inferences drawn from the conduct of the accused. The knowing and volitional conduct of a defendant is probative of his mental state insofar as he may be found to have intended the ordinary and natural consequences of his acts." (Citation omitted.) *State* v. *Crafts*, 226 Conn. 237, 248, 627 A.2d 877 (1993).

In this case, there was ample evidence from which the jury reasonably could have concluded that the defendant possessed the specific intent to cause death and physical injury.[12] The defendant admitted in his trial testimony that he intentionally fired gunshots at people. There also was video surveillance evidence that showed the defendant firing two separate series of gunshots into the crowd of people. The defendant's admitted discharge of a handgun into the crowd assembled outside the bar and the video surveillance footage were evidence from which the jury could have concluded that he intended to kill or injure another person. See *State* v. *Otto*, 305 Conn. 51, 68, 43 A.3d 629 (2012) (types of circumstantial evidence of intent to kill include type of instrument used and manner of use).

In addition, shortly before shooting into the crowd, the defendant engaged in certain preparatory acts, namely, he left the bar, went to Gonzalez' car, retrieved his gun, and took up a position at the bank opposite the bar. The jury reasonably could have inferred from these preparatory acts, as well as from the shooting itself, that the defendant intended to cause death or physical injury. See *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993) (defendant carrying deadly weapon prior to homicide may be evidence that defendant intended to cause victim's death); *State* v. *White*, 127 Conn. App. 846, 854, 17 A.3d 72 (same), cert. denied, 302 Conn. 911, 27 A.3d 371 (2011).

A number of the defendant's actions following the shooting reasonably supported an inference of consciousness of guilt, which, "in combination with the defendant's use of a deadly weapon provided sufficient evidence for the jury to find that the defendant intended to cause the victim's death."[13] *State* v. *Moye*, 119 Conn. App. 143, 150, 986 A.2d 1134, cert. denied, 297 Conn. 907, 995 A.2d 638 (2010); *State* v. *Otto*, supra, 305 Conn. 73 ("consciousness of guilt evidence [is] part of the evidence from which a jury may draw an inference of an intent to kill" [internal quotation marks omitted]). In particular, the defendant and his friends fled from the scene immediately after the shooting. See *State* v. *Booth*, 250 Conn. 611, 653, 737 A.2d 404 (1999) ("when a person flees the crime scene . . . it is reasonable to infer that that person had the intent to murder"), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). Additionally, the defendant admitted that he adopted Colon's fabricated alibi. From the defendant and Colon's efforts to place the defendant elsewhere at the time of the crimes, the

jury reasonably could have inferred a consciousness of guilt, and from there, the requisite intent to cause death or physical injury. *State* v. *Reid*, 193 Conn. 646, 656, 480 A.2d 463 (1984); *State* v. *Pelletier*, 85 Conn. App. 71, 81, 856 A.2d 435, cert. denied, 272 Conn. 911, 863 A.2d 703 (2004). Finally, the defendant disposed of the gun in the river and attempted to persuade Rojas to corroborate the alibi that he and Colon had fabricated. See *State* v. *White*, supra, 127 Conn. App. 854–55 (disposal of murder weapon and attempt to influence witness testimony are circumstantial evidence of intent). In sum, there was ample evidence, apart from the evidence linking the defendant to the 2009 shooting, from which the jury could have concluded that he possessed the intent required for conviction of the charged crimes.

There also was ample evidence on the basis of which the jury reasonably could have concluded that the state disproved beyond a reasonable doubt the defendant's asserted justification that he had fired a weapon into the assembled crowd to defend his friends.[14] The defendant's evidence in support of his defense was weak. His testimony was the only evidence—other than Colon's testimony, given after the falsity of the defendant's alibi had been exposed, that the defendant told her someone was aiming a gun at her and Bonilla—supporting his claim that he was defending his friends. He was the only individual among many witnesses present at the scene who testified to seeing a man on the corner display a gun. Although he testified both that he had seen a man aim a gun at his friends and that the person he shot had to have dropped the gun when he was hit by a bullet, no firearm was found at the scene. See *State* v. *Saunders*, 267 Conn. 363, 374–75, 838 A.2d 186 (jury could have discredited defendant's assertion that he feared victim would shoot him where victim never displayed or brandished weapon and no weapon recovered at scene), cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

In contrast to the defendant's evidence, the state's evidence to disprove the defense of others theory was strong. The state presented evidence that undermined the credibility of the defendant's assertion that he believed a man on the corner was about to fire a gun at his friends, necessitating his use of deadly force. The defendant's calm demeanor both when he left the bar and when he took up a position in front of the bank and began firing into the assembled crowd, as displayed in the various surveillance videos that the state adduced, belied his claim that he feared someone was about to fire at his friends. See id., 375 ("the defendant's calm demeanor when he fired the shots that killed the victim suggests that he was not afraid that the victim was reaching for a gun").

The state also presented evidence on the basis of which the jury could have concluded that the defen-

dant's belief in the amount of force needed to repel the alleged attack on his friends was unreasonable. See footnote 14 of this opinion. As previously noted in this opinion, the bank's video surveillance footage indicated that the defendant fired an initial volley of shots, paused, and fired a second series of shots. When presented with the footage, the defendant admitted on cross-examination that he had fired the shots in two distinct bursts. Furthermore, although the defendant also testified that he ran off as soon as he saw the person with the gun drop to the ground, Flores was the only shooting victim to drop to the ground; Forbes and Schroeter both testified that they were running from the gunfire when they realized that they each had been shot. Together, "[t]his evidence supported a finding that the defendant safely could have stopped firing, but elected not to do so, even though the victim no longer posed a threat . . . . Consequently, the jury reasonably could have found that the defendant's actions were excessive and beyond those reasonably necessary to repel any attack" against his friends. *State* v. *Saunders*, supra, 267 Conn. 376.

The credibility of the defendant's asserted justification defense also was undermined by the combination of his admission that he previously had fabricated an alibi and evidence that he began claiming defense of others only after that justification was suggested to him. As previously discussed, the defendant and Colon both admitted that they had fabricated the defendant's alibi. In its rebuttal case, the state presented evidence from which the jury reasonably could have inferred that the defendant decided to begin claiming that he had acted in defense of his friends based on the scenario that Sullivan had suggested when he asked if the defendant would testify before the grand jury. The defendant did not claim that he acted to defend his friends until he testified at his trial. Although he conceded that if Sullivan did say something about self-defense, the defendant would have taken the opportunity and started telling people that he was defending his friends, he asserted that Sullivan had not mentioned self-defense. Playback of the recording of the meeting between Sullivan and the defendant belied this assertion.

Indeed, Sullivan told the defendant that "[a]ll I know is what the people tell us, they put a gun in your hand and you're shooting and a girl dies. Now in my eyes that's murder, unless there's an explanation. You know, if somebody else had a gun say, on the corner, and you were shooting at them to protect yourself, that's not necessarily murder, you know what I'm saying, there's a lot of different versions of events that influence what the charge would be. That's why we give you an opportunity to explain it, but that's your choice." Thereafter, for the first time, the defendant, on the witness stand, offered a justification of the shooting that hewed closely to the scenario that Sullivan had suggested. In sum,

there was ample evidence, apart from the evidence linking the defendant to the 2009 shooting, from which the jury could have concluded, as was implicit in its verdict, that the state had disproved the defendant's justification of defense of others.

For the foregoing reasons, we conclude that, even assuming, without deciding, that the court's instructions and final charge permitting the jury to consider the prior misconduct evidence as it bore on the defendant's intent were improper, any error was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] At trial, the defendant raised a defense of others defense in relation to the murder and assault charges. In his opening brief in this appeal, the defendant claimed that "the court's [jury] charge, pursuant to the pattern instruction on defense of others, engrafted the language 'honestly and sincerely' to define the defendant's 'actual belief' in both the necessity to use force and necessary degree of force, and to define the state's burden of disproof, constituted reversible error." In his reply brief and at oral argument, however, the defendant conceded that the recently decided case of *State v. O'Bryan*, 318 Conn. 621, 633, 123 A.3d 398 (2015), in which our Supreme Court held that "the well established usage of [the] terms [honestly and sincerely] in our case law is consistent with the requirement that the defendant in fact . . . believed that the use of deadly force was necessary, before determining whether that belief was reasonable," is controlling authority that defeats this claim.

We agree with the defendant that *O'Bryan* disposes of this claim, and, therefore, we need not address it in this appeal.

[2] Zene explained that the term "ratchet" is a street term for a gun.

[3] Wilis testified that just prior to hearing gunfire, he saw two men "creeping around the corner" from Franklin Avenue to Brown Street. Wilis testified that one appeared to have a bottle, and the other appeared to have a gun. He also testified, however, that he "couldn't really tell what it was, if it was a bottle or if it was a gun or not."

[4] When shots were fired, Forbes testified that he was at the corner of Franklin Avenue and Brown Street and had just put his left arm across his friend Cecil Pierce's chest to restrain the latter from approaching another patron. Schroeter testified that Forbes was running toward Brown Street and that he tried to stop Forbes, but shots were fired before he had a chance to do so.

[5] The witness' name alternately is spelled Coby and Colby. Although the prosecutor indicated that the correct spelling is Coby, the court reporter recorded the witness' name as Colby. For ease of reference, we refer to the witness as Colby throughout this opinion.

[6] The court stated the following: "I'm going to let the evidence in because it is exquisitely probative since it identifies the same exact handgun used in two cases in which the defendant is identified [as the shooter], [in] one as the only shooter and [in] the other as one of two shooters, showing access to the instrumentality . . . ."

[7] The court briefly excused the jury after Colby's testimony, and, upon its return, gave the following instruction: "Just to place a context, ladies and gentlemen, for the last witness and there may be a couple other witnesses, there was some testimony about an incident that is not on trial here from Mr. Colby. About a different night, different event in which he alleges misconduct on the part of the defendant, that's not being admitted to prove bad character or propensity for criminal tendency of the defendant. Such evidence is offered for a limited purpose solely to establish the defendant's intent in the actual crime that is charged in this case or crimes that are charged in this case. And potentially as you may hear from other witnesses to show access to possession of an instrumentality, to wit: a handgun."

[8] After the state rested its case-in-chief, the court gave the following instruction: "I will remind you the witnesses this afternoon, both Mr. Colby and Ms. Pytlik, were here offering evidence of other acts of misconduct from the defendant, not admitted to prove his bad character, propensity for criminal tendencies, admitted solely to show or establish his intent or his access to the instrumentality involved in the case that is on trial."

[9] General Statutes § 53a-19 (a) provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

[10] No gun was recovered from the corner of Franklin Avenue and Brown Street.

[11] The court gave the following limiting instruction: "[T]he state offered evidence of another act of misconduct of the defendant. This is not being admitted to prove the bad character, propensity or criminal tendencies of the defendant. Such evidence is being admitted solely to show or establish the defendant's intent and the defendant's access to the instrumentality of the crime, the gun. This instruction refers to the evidence concerning the alleged incident on Bond Street on June 6, [2009].

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues of the defendant's intent and the defendant's access to the instrumentality used in this case.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely the defendant's intent and the defendant's access to the instrumentality used, then you may not consider that testimony for any purpose. You may not consider evidence of other misconduct of the defendant for any purpose other than the ones I've just told you, because it may predispose your mind uncritically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For this reason, you may consider this evidence only on the issues of the defendant's intent and the defendant's access to the instrumentality used, and for no other purpose."

[12] Murder requires the specific intent to cause the death of another person; *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993); and assault in the first degree "requires that the criminal actor possess the specific intent to cause physical injury to another person." *State* v. *LaFountain*, 127 Conn. App. 819, 828, 16 A.3d 761, cert. denied, 301 Conn. 921, 22 A.3d 1281 (2011).

[13] After providing a generalized instruction regarding consciousness of guilt, the court in the present case instructed the jury that the defendant's statements as to his whereabouts at the time of the shooting, if determined to be false, could be used as evidence of consciousness of guilt.

[14] Self-defense, or defense of a third person, as defined in § 53a-19 (a); see footnote 9 of this opinion; is a defense, which, when properly raised, "places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. . . .

"[U]nder § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . [T]he test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable. . . .

"The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circum-

stances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19." (Internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 631–33, 123 A.3d 398 (2015).

---