******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ZACHERY FRANKLIN
## (AC 39180)

DiPentima, C. J., and Keller and Beach, Js.

*Syllabus*

Convicted of multiple crimes as a result of the shooting death of the victim in the city of Waterbury, the defendant appealed, claiming, inter alia, that the evidence was insufficient to sustain his conviction of murder and criminal possession of a firearm, and that the trial court abused its discretion by admitting certain uncharged misconduct evidence. The defendant and another individual had exited a black Acura automobile, approached a motorcycle that was parked in a driveway, and, from a distance of about eight and one-half feet, shot its operator to death. The shooting continued as the motorcycle crashed into a stop sign. The next day, the defendant and another individual, S, who had been with the defendant in Waterbury the previous day, were seen in New Haven shooting handguns before driving off in a black Acura. Bullet evidence recovered there by the police matched bullet evidence that they recovered at the murder scene. S was later arrested and implicated the defendant in the murder. The police also developed evidence that during the events leading up to the murder, the defendant had a cell phone that was owned by S's sister, I. While the defendant was incarcerated and awaiting trial, he told another individual, H, who was incarcerated in the same correctional center and who testified at the defendant's trial, that he had killed the victim for the purpose of stealing the victim's motorcycle and a neck chain that the victim wore. *Held*:

1. Contrary to the defendant's claim, the evidence was sufficient to support his conviction of murder: the evidence supported the jury's finding that the defendant was one of the individuals who exited the Acura and shot at the victim, as H testified that the defendant told him while they were incarcerated together that he exited the Acura and shot the victim in an attempt to rob him, and that the defendant stated that he was linked to the shooting as a result of both S's having spoken to the police, and the recovery by the police of video footage and firearms evidence, and the jury in turn credited H's testimony regarding the defendant's confession; furthermore, the jury's finding that the defendant possessed the intent to kill the victim was supported by evidence that the defendant wanted to rob the victim of the motorcycle and the chain that the victim wore, that the defendant fired several gunshots at the motorcycle from a distance of eight and one-half feet, and that he fled from the shooting scene without providing medical assistance to the victim and was in possession of false identification when he was detained by the police.

2. There was sufficient evidence to support the defendant's conviction of criminal possession of a firearm, the parties having stipulated at trial that the defendant had been convicted of a felony prior to the shooting of the victim, and the evidence having been sufficient for the jury to find that the defendant was one of the individuals who had exited the Acura and shot at the victim while he was on the motorcycle.

3. The trial court did not abuse its discretion when it admitted uncharged misconduct evidence, offered by the state to demonstrate that the defendant possessed a firearm that was used in the victim's shooting in Waterbury, that included a photograph of a crime scene in New Haven that depicted police tape and testimony that the defendant, on the day after the shooting in Waterbury, possessed and fired a weapon in the back of a building in New Haven: in light of the details of the crimes at issue in this case, evidence that the defendant possessed and discharged a firearm in the back of a building would not unduly arouse the emotions, hostility or sympathy of the jury, as the court heard oral argument from the parties, considered their motions and briefs, and prevented the jury from hearing the most inflammatory details of the uncharged misconduct evidence; furthermore, the probative value of the misconduct evidence outweighed its prejudicial effect because it helped identify the defendant as a shooter in Waterbury, the court instructed the jurors to refrain from considering the police tape in the

photograph taken in New Haven, and there was ample testimony that the police investigated that location after a report that gunshots had been fired there.

4. The defendant could not prevail on his claim that his right to a fair trial was violated when the prosecutor made certain allegedly improper remarks during closing argument to the jury: although the prosecutor's incorrect statement that a witness testified that two men approached the motorcycle after it crashed into a stop sign may have been improper, it did not appear to have been intentional, the defendant did not object to the comment when it was made, the comment was only a small part of the prosecutor's summation and was not related to a critical issue in the case, and the state's case against the defendant was strong; furthermore, the prosecutor's comments that the defendant possessed and used a certain phone belonging to I during the events leading up to the murder, and that H's testimony included an admission by the defendant that he shot the victim and took the victim's neck chain were based on evidence, and although the prosecutor's characterization of the neck chain was not part of the evidence, it did not violate the defendant's right to due process.

Argued February 6—officially released July 25, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Cremins, J.*; thereafter, the court sustained in part the defendant's objection to the admission of certain evidence; verdict of guilty; subsequently, the court denied the defendant's motion for a judgment of acquittal and for a new trial, and rendered judgment in accordance with the verdict; thereafter, the court vacated the conviction of felony murder, and the defendant appealed. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *David A. Gulick*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Zachery Franklin, appeals from the judgment of conviction, following a jury trial, of murder, in violation of General Statutes § 53a-54a, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-134 (a) (2), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1] On appeal, the defendant claims that (1) the evidence was insufficient to sustain his conviction of murder and criminal possession of a firearm, (2) the court abused its discretion by admitting certain uncharged misconduct evidence and (3) his right to a fair trial was violated as a result of prosecutorial impropriety. We disagree, and, accordingly, affirm the judgment of conviction.

The jury reasonably could have found the following facts. During the evening of July 7, 2011, James Beaulieu rode on a two seat, three-wheeled motorcycle known as a T-Rex[2] driven by the victim, Luis Cruz. The two returned to Boyden Street in Waterbury, where Beaulieu had parked his motorcycle. At approximately 1:30 a.m. on July 8, 2011, Adam Maringola, who was working in a nearby building, heard a loud noise and watched as the victim pulled into a driveway and stopped briefly.

Maringola observed a black Acura near the T-Rex. He then saw two people exit the Acura and walk toward the T-Rex. The victim became alarmed and backed out of the driveway. The two individuals from the Acura began shooting at the T-Rex from a distance of approximately eight and one-half feet. The shooting continued as the T-Rex crashed into a stop sign. Beaulieu pushed himself out of the T-Rex and ran up a hill. Maringola watched the two men from the Acura shoot at Beaulieu as he fled.

One of the men from the Acura approached the T-Rex and ordered the victim to exit. The victim replied that he was unable to do so and then was shot multiple times. This shooter continued to pull the trigger of the firearm even though he had discharged all of its ammunition. After the cessation of gunshots, another witness, Sade Canada, heard someone say, "just leave him, let's go," and the shooters returned to the Acura and drove off. Later that evening, the defendant was overheard telling his girlfriend, Isis Hargrove, that "we just did some hot shit," and appeared nervous.

After a brief period of time, Beaulieu returned to the T-Rex and saw that the victim had remained in it and was not moving. Waterbury police officers arrived and secured the area. At 1:37 a.m., paramedic Joshua Stokes was dispatched to the scene. He observed that the victim had lost a "copious" amount of blood, suffered multiple gunshot wounds and had no pulse or lung

sounds. After consulting with a physician from Waterbury Hospital via telephone, the victim was pronounced dead at the scene.[3]

The next day, July 9, 2011, Antonio Lofton, a resident of New Haven, was in his backyard. Lofton observed the defendant and Earl Simpson shoot handguns five or six times before driving off in a black Acura.[4] The noise from the firearms resulted in a report to the police, and Myra Nieves, a New Haven police detective, commenced an investigation. She recovered six bullet casings and one projectile from that area. These items were sent to the state forensics laboratory for testing.

At the location of the Waterbury shooting, Brian Juengst, a crime scene technician, participated in the recovery of thirteen shell casings and three intact projectiles.[5] Orlando Rivera, a detective with the Waterbury Police Department, investigated the homicide and learned that a dark-colored vehicle, later determined to be a black Acura, had been used by the shooters. Rivera obtained video from businesses located near the shooting. These videos showed the black Acura following the T-Rex until it pulled into the driveway on Boyden Street. Rivera also learned that the casings and projectiles found at the Waterbury crime scene were connected to a criminal investigation in New Haven.[6] Rivera communicated with investigators in New Haven and obtained the names of the defendant, Isis Hargrove, Simpson and Shaquan Armour. Hargrove, who was the girlfriend of the defendant and the sister of Simpson, owned the black Acura. Using this information, Rivera obtained a search warrant for the cell phone records of Simpson and Hargrove. These records established that Hargrove was in the area of the Waterbury shooting at the time of that incident. After successfully applying for a warrant on August 26, 2011, Rivera seized the Acura. Discolorations on this vehicle matched those that were visible on the videos from the night of the shooting.

On July 29, 2011, Rivera learned that Simpson had been arrested in North Carolina. Approximately six weeks later, Rivera interviewed Simpson, who provided a written statement regarding the events of July 8, 2011. Simpson admitted that he and the defendant were in the area of Boyden Street in Waterbury at the time of the shooting. As a result of the investigation, Rivera obtained an arrest warrant for the defendant, and he was taken into custody on November 16, 2011.[7]

During the defendant's pretrial incarceration, he spoke with Joshua Habib, who also was held at the New Haven Correctional Center. Habib offered to transport a letter from the defendant to Hargrove, who at that time was incarcerated with Habib's girlfriend in another correctional facility. During their conversation, the two men discussed the shooting in Waterbury. The defendant told Habib that the victim had been killed for

the purpose of stealing the T-Rex and a chain. The defendant provided specifics regarding the Waterbury shooting, telling Habib that "he got out of the car and shot [the victim], and they were attempting or he— intentions was to rob [the victim] for the [T-Rex] . . . ." The defendant also told Habib that the case against him was based on circumstantial evidence.

The jury found the defendant guilty on all charges. The court sentenced the defendant to seventy-five years incarceration, thirty-two of which were mandatory. On August 27, 2014, the court vacated the conviction of felony murder, but did not alter the length of the defendant's sentence.[8] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to sustain his conviction of murder and criminal possession of a firearm.[9] Specifically, he argues that the state failed to present sufficient evidence that he had fired the gun during the Waterbury shooting, and therefore, his conviction of murder and criminal possession of a firearm cannot stand. We are not persuaded.

As a preliminary matter, we note that the defendant preserved this claim by moving for a judgment of acquittal at the conclusion of the state's evidence, pursuant to Practice Book §§ 42-40 and 42-41.[10] See *State* v. *Taft*, 306 Conn. 749, 753 n.6, 51 A.3d 988 (2012); *State* v. *Brown*, 118 Conn. App. 418, 422, 984 A.2d 86 (2009), cert. denied, 295 Conn. 901, 988 A.2d 877 (2010). Specifically, defense counsel argued that there was no evidence that he possessed a firearm on July 8, 2011. With respect to the murder charge, defense counsel contended that there was no evidence that the defendant had been one of the two shooters who had exited the black Acura. Additionally, defense counsel noted that two of the eyewitnesses had testified that the shooters had dark skin, but that the defendant had light skin. The court denied the defendant's motion. The defendant also filed a postverdict motion for a judgment of acquittal[11] that the court denied prior to sentencing.

Next, we set forth our standard of review and the legal principles relevant to a claim of evidentiary insufficiency. We recently iterated that "a defendant who asserts an insufficiency of the evidence claims bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Leniart*, 166 Conn. App. 142, 169, 140 A.3d 1026, cert. granted on other grounds, 323 Conn. 918, 149 A.3d 499, 150 A.3d 1149 (2016). "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom

the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Badaracco*, 156 Conn. App. 650, 657–58, 114 A.3d 507 (2015); see also *State* v. *Bush*, 325 Conn. 272, 285–86, 157 A.3d 586 (2017). Guided by these principles, we consider the defendant's appellate arguments in turn.

A

The defendant first argues that the evidence was insufficient to support his conviction of murder[12] because the "state presented no direct evidence that identified the defendant as one firing shots or one that solicited, requested, commanded, importuned or intentionally aided anyone in the shooting of the victim. The circumstantial evidence presented in this case was not sufficient to have found the defendant guilty of murder." Specifically, he contends that the state failed to prove that he was one of the individuals who fired a gun at

the victim or that he had intended to kill the victim. We are not persuaded.

The operative information did not charge the defendant with murder as an accessory. It is not disputed, however, that he was tried as a principal or an accessory on the murder charge.[13] Thus, to convict the defendant, the state was required to prove that he was one of the two men, who, after exiting the Acura, shot at the victim in the T-Rex. See, e.g., *State* v. *Jackson*, 257 Conn. 198, 206, 777 A.2d 591 (2001) (question of identity of perpetrator of crime is question of fact for jury to resolve); *State* v. *Rodriguez*, 133 Conn. App. 721, 728, 36 A.3d 724 (2012) (same), aff'd, 311 Conn. 80, 83 A.3d 595 (2014). The state was not required, however, to prove that the defendant fired the fatal gunshot. *State* v. *Allen*, 289 Conn. 550, 559–60, 958 A.2d 1214 (2008); *State* v. *Hamlett*, 105 Conn. App. 862, 866–67, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

1

The defendant contends that there was no evidence that he exited the Acura and fired a gun at the victim. This claim, however, ignores the testimony of Habib, the individual who spoke with the defendant about the shooting while incarcerated at the New Haven Correctional Center. Habib initially testified that the defendant had told him that "*they* killed [the victim] for the—his chain, and *they* basically were going to rob [the victim] of the three-wheeler that he was riding and—which *they* ended up not taking. *They* just took his chain." (Emphasis added.) Habib then clarified his testimony as follows: "[The defendant] said that *he* got out of the car and shot [the victim] and they were attempting or *he*—intentions was to rob him for the three-wheeler they were riding or *he*—the . . . [*h*]*is* intentions were to rob the—the victim of the three-wheeler he was riding and whatever he may have had on him . . . ." (Emphasis added.)

Our Supreme Court has noted that "[w]here the authenticity and reliability of a confession are established, it is certainly true that we have before us the highest sort of evidence." (Internal quotation marks omitted.) *State* v. *Ruth*, 181 Conn. 187, 197, 435 A.2d 3 (1980). In *Ruth*, the court concluded that the defendant's confession, coupled with "more than ample evidence of the corpus delicti" and accomplice testimony constituted overwhelming evidence of guilt. Id., 199. In the present case, the state presented Habib's testimony in which the defendant admitted that he exited the Acura and then shot the victim. Contrary to the defendant's appellate argument, the state produced evidence that the defendant possessed the gun and shot the victim in Waterbury in the early hours of July 8, 2011.

Habib also testified that he never had lived in New Haven, and that he met the defendant for the first time

while incarcerated at the New Haven Correctional Center in March, 2012. Specifically, Habib indicated that he "didn't know nothing" about the defendant at that time. The defendant told Habib that the case against him was based entirely on circumstantial evidence and that the only thing that linked him to death of the victim was that Simpson had spoken to the police following his arrest "down South." The defendant also stated to Habib that the video footage recovered by the police did not show the defendant's face or the license plates on Hargrove's Acura, but did include the bullet holes present on the vehicle. Finally, the defendant revealed to Habib that some firearms evidence had been recovered from his home that linked him to the shooting of the victim. These additional details bolstered Habib's credibility, despite his status as a jailhouse informant.[14] The jury, in turn, credited Habib's testimony regarding the defendant's confession, which served as the link between the death of the victim and the defendant.[15] See *State* v. *Farnum*, 275 Conn. 26, 33, 878 A.2d 1095 (2005).

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence in the present case was sufficient to support the jury's finding that the defendant was one of the individuals who exited the Acura and shot at the victim. Accordingly, we conclude that the defendant's claim to the contrary must fail.

2

The defendant next contends that the state failed to prove that he had intended to kill the victim. This contention is based, in large part, on the defendant's argument that there was insufficient evidence to prove that he was one of the men who exited the Acura and shot at the victim. Having rejected that underlying premise in part I A 1 of this opinion, we similarly are not persuaded by the defendant's contention that the state failed to produce sufficient evidence regarding the element of intent.

In order to convict the defendant of murder, the state was required to prove, beyond a reasonable doubt, that he had the intent to cause the death of another person. *State* v. *White*, 127 Conn. App. 846, 851–52, 17 A.3d 72, cert. denied, 302 Conn. 911, 27 A.3d 371 (2011). "Under . . . § 53a-54a (a), the state must prove that the defendant acted with the specific intent to cause the death of the victim. . . . Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . .

"Whether a criminal defendant possessed the specific intent to kill is a question for the trier of fact. . . . This court will not disturb the trier's determination if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the [fact finder] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [fact finder's] function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citation omitted; internal quotation marks omitted.) *State* v. *Ames*, 171 Conn. App. 486, 507, 157 A.3d 660 (2017); see also *State* v. *Medina*, 228 Conn. 281, 303, 636 A.2d 351 (1994) (defendant acts intentionally in causing death of another when he has conscious objective to cause another's death); *State* v. *Leniart*, supra, 166 Conn. App. 175–76 (same).

Our Supreme Court has recognized that "[i]ntent to cause death may be inferred from the type of weapon used, the manner which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012).

In the present case, there was evidence that the defendant wanted to rob the victim of the T-Rex vehicle and of a chain worn around his neck. After following the victim for a period of time, the defendant exited the Acura armed with a firearm. From a distance of approximately eight and one-half feet, the defendant aimed the firearm at the T-Rex and fired several rounds. He then fled without providing any medical assistance, and, when detained by law enforcement, possessed false identification. On the basis of these facts, we conclude that there was evidence for the jury to conclude that the defendant possessed the intent necessary to support his conviction of murder. See, e.g., *State* v. *Gary*, 273 Conn. 393, 408–409, 869 A.2d 1236 (2005); see also *State* v. *Floyd*, 253 Conn. 700, 720, 756 A.2d 799 (2000) (jury could infer intent to cause victim's death where defendant fired multiple gunshots at victim as he lay on ground); *State* v. *Sanchez*, 166 Conn. App. 665, 679–80, 146 A.3d 344 (defendant's firing of series of gunshots at crowd and immediately leaving scene of shooting constituted evidence of specific intent to kill or injure another person), cert. denied, 323 Conn. 917, 149 A.3d 498 (2016); *State* v. *Leniart*, supra, 166 Conn. App. 177 (defendant's failure to obtain, or attempt to obtain, medical assistance for victim constituted evidence of intent to kill); *State* v. *Grant*, 149 Conn. App. 41, 50, 87 A.3d

1150 (consciousness of guilt evidence may be used to draw inference of intent to kill), cert. denied, 312 Conn. 907, 93 A.3d 158 (2014); *State* v. *Wright*, 77 Conn. App. 80, 93, 822 A.2d 940 (fleeing scene of shooting while in possession of gun indicative of intent to commit murder), cert. denied, 266 Conn. 913, 833 A.2d 466 (2003). We conclude, therefore, that sufficient evidence existed to support the jury's finding that the defendant possessed the intent necessary to find him guilty of murder.

B

The defendant also argues that the evidence was insufficient to support his conviction of criminal possession of a firearm. We note that this claim is based on the contention that the defendant was not one of the individuals who exited the Acura and shot at the victim on the T-Rex. In part I A of our opinion, we rejected that argument. We further conclude that the evidence was sufficient to support the defendant's conviction of criminal possession of a firearm in violation of § 53a-217.

Section 53a-217 (a) provides in relevant part that "[a] person is guilty of criminal possession of a firearm . . . when such person possesses a firearm, ammunition or an electronic defense weapon and (1) has been convicted of a felony committed prior to, on or after October 1, 2013 . . . ." See also *State* v. *Beavers*, 99 Conn. App. 183, 189, 912 A.2d 1105, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007). The term "firearm" is statutorily defined in General Statutes § 53a-3 (19) as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Beavers*, supra, 189.

In the present case, the parties stipulated that the defendant had been convicted of a felony prior to July 8, 2011. Additionally, we have concluded that there was sufficient evidence for the jury to find that he was one of the two individuals who exited the Acura and shot at the victim while he was on the T-Rex. Accordingly, we conclude that there was sufficient evidence to support the defendant's conviction of criminal possession of a firearm.

II

The defendant next claims that the court abused its discretion in admitting uncharged misconduct evidence. Specifically, he argues that the prejudicial impact of certain evidence from the New Haven crime scene outweighed its probative value. We are not persuaded.

The following additional facts are necessary for our discussion. On December 20, 2013, the state filed notice of its intent to offer into evidence uncharged acts of misconduct by the defendant.[16] Specifically, it sought

to present evidence that approximately sixteen and one-half hours after the Waterbury shooting, the defendant shot and killed another person during a robbery in New Haven. Further, the state sought to introduce evidence that the firearm was used in both the Waterbury and New Haven killings, and that Simpson was with the defendant during both crimes. The defendant objected to the uncharged misconduct evidence. During jury selection, the court directed counsel to review *State* v. *Collins*, 299 Conn. 567, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011), which was applicable, in the court's view, to the uncharged misconduct issue in the present case. At this point, the state noted that it intended to "sanitize" the evidence from the New Haven shooting to show only that the defendant had possessed a firearm used in the Waterbury shooting the previous day.

On May 13, 2014, the court ruled that the state would be permitted to present evidence that the defendant had possessed and fired a weapon in New Haven the day after the Waterbury shooting. On May 19, 2014, the state called Antonio Lofton as a witness. Prior to his testimony and outside of the presence of the jury, the court provided a cautionary warning where it instructed Lofton to refrain from mentioning the New Haven homicide and to limit his testimony to the fact that he had observed the defendant possess and discharge a firearm on July 9, 2011.

Defense counsel also noted his objection to a photograph of the New Haven crime scene that included police tape. After a brief discussion, some of which was held off the record at sidebar, the court indicated that it would allow the photograph to be admitted into evidence. Defense counsel argued that the prejudicial impact of the police tape in the photograph outweighed its probative value. As Lofton took the witness stand, the court specifically instructed him to refrain from mentioning the homicide that had occurred in New Haven.[17]

Lofton testified that he lived in New Haven on July 9, 2011, and that his sister was pregnant with the defendant's child. In the early evening, Lofton was sitting in his backyard when he heard multiple gunshots coming from behind a nearby brick building. Lofton stated that he had observed the defendant and Simpson shoot handguns five or six times before driving off in a black Acura. The prosecutor presented a photograph, which was admitted into evidence over the defendant's objection. The court instructed the jury that it was not to consider the police tape depicted in the photograph.

During the trial, the state also presented evidence from Nieves, a New Haven police detective, and James Stephenson, a state firearms and tool mark examiner, regarding the bullets and casings recovered from the site of the New Haven shooting. These witnesses estab-

lished that the two firearms used in the New Haven shooting were the same as those used in the Waterbury shooting.

We now turn to the relevant legal principles and our standard of review for claims that the court improperly admitted uncharged misconduct evidence. "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Torres*, 168 Conn. App. 611, 619–20, 148 A.3d 238 (2016), cert. granted on other grounds, 325 Conn. 919,      A.3d      (2017); see also *State* v. *Pena*, 301 Conn. 669, 673–74, 22 A.3d 611 (2011); Conn. Code Evid. (2009) § 4-5 (b).[18]

In the present case, the court determined that the evidence from the New Haven shooting was probative of the defendant's "means" to commit the Waterbury shooting. "Evidence indicating that an accused possessed an article with which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime. . . . The state does not have to connect a weapon directly to the defendant and the crime. It is necessary only that the weapon be suitable for the commission of the offense." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Franklin*, 162 Conn. App. 78, 96, 129 A.3d 770 (2015), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016); see also *State* v. *Torres*, supra, 168 Conn. App. 620. In his brief to this court, the defendant focuses his appellate claim on the prejudice prong.[19]

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be

admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Torres*, supra, 168 Conn. App. 623–24; see also *State* v. *Rosario*, 99 Conn. App. 92, 104, 912 A.2d 1064, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007).

The defendant argues that the uncharged misconduct evidence, specifically, that Lofton's testimony that he observed the defendant discharge a firearm,[20] aroused the emotions, hostility or sympathy of the members of the jury.[21] He further maintains that this evidence exceeded what was necessary to link the two crime scenes and made him, in the eyes of the jurors, "a person who acted violently, harmed or threatened to harm people and called into question his character." Finally, the defendant asserts that the admission into evidence of a photograph of the New Haven crime scene that contained police tape was too prejudicial because the jury then knew of his conviction of crimes from that shooting.

The defendant was charged, inter alia, with shooting the victim during an attempted robbery. Given the details of the Waterbury crimes, evidence that he discharged a firearm behind a brick building would not unduly arouse the emotions of the jurors. See *State* v. *Estrella J.C.*, 169 Conn. App. 56, 99, 148 A.3d 594 (2016). The possession of a firearm likely would not cause an improper emotional response from the jury in a case where the defendant was charged, inter alia, with murder. See *State* v. *Collins*, supra, 299 Conn. 587–88; *State* v. *Torres*, supra, 168 Conn. App. 626; see generally *State* v. *Smith*, 313 Conn. 325, 342–43, 96 A.3d 1238 (2014) (prejudicial effect minimized by limited testimony to " 'bare bones' " account of misconduct); *State* v. *Morales*, 164 Conn. App. 143, 181, 136 A.3d 278 (when prior acts of misconduct were substantially less shocking than crimes charged, Appellate Court consistently has declined to conclude admission of evidence was unduly prejudicial), cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016). Moreover, the court considered the written motions and briefs of the parties, as well as extensive oral argument, and prevented the jury from hearing the most inflammatory details of the New Haven

incident. See *State* v. *Torres*, supra, 625; *State* v. *Kantorowski*, 144 Conn. App. 477, 489–92, 72 A.3d 1228 (care used by trial court in sanitizing uncharged misconduct evidence militates against finding abuse of discretion), cert. denied, 310 Conn. 924, 77 A.3d 141 (2013). The court also directly instructed Lofton to refrain from mentioning the homicide that had occurred in New Haven involving the defendant and permitted leading questions to help the witnesses avoid mentioning the more inflammatory details of the New Haven events. See *State* v. *Collins*, supra, 589 (care taken by trial court to devise measures to reduce any prejudicial impact militates against finding abuse of discretion). We further conclude that the presence of police tape in the photograph from the New Haven crime provided minimal prejudicial impact, as there was ample testimony that the police investigated that location following a report of gunshots fired. Finally, the court provided the jurors with a limiting instruction directing them to refrain from considering the police tape. See *State* v. *Gonzalez*, 167 Conn. App. 298, 310, 142 A.3d 1227, cert. denied, 323 Conn. 929, 149 A.3d 500 (2016); see also *State* v. *Collins*, supra, 590. Any prejudice was outweighed by the probative value of the evidence that helped identify the defendant as a shooter in Waterbury on July 8, 2011. See, e.g., *State* v. *Gonsalves*, 137 Conn. App. 237, 247–49, 47 A.3d 923, cert. denied, 307 Conn. 912, 53 A.3d 998 (2012). Affording due deference to the ruling of the trial court, we conclude that it did not abuse its discretion in determining that the probative value of the uncharged misconduct evidence outweighed its prejudicial impact.

## III

The defendant's final claim is that his right to a fair trial was violated as a result of prosecutorial impropriety. Specifically, he argues that the prosecutor made several mistakes regarding the evidence during his closing arguments to the jury, and that as a result, he was denied his due process right to a fair trial. The state counters that none of the claimed mistakes constituted prosecutorial impropriety and, even if this court were to conclude otherwise, the defendant failed to establish that he had been denied a fair trial. We conclude that the defendant's right to a fair trial was not violated in this case.

The legal principles regarding a claim of prosecutorial impropriety are well established. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum

total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair . . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Accordingly, it is not the prosecutorial improprieties themselves but, rather, the nature and extent of the prejudice resulting therefrom that determines whether a defendant is entitled to a new trial. . . .

"To determine whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams* [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Rios*, 171 Conn. App. 1, 51–52, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017); see also *State* v. *Jones*, 320 Conn. 22, 34–35, 128 A.3d 431 (2015). The defendant bears the burden of demonstrating both that the comments were improper and that they were so egregious as to constitute a denial of due process. *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

Additionally, "[i]t is well settled that the prosecutor, as a public official seeking impartial justice on behalf of the people of this state, has a heightened duty to avoid argument [or questioning] that strays from the evidence or diverts the jury's attention from the facts of the case. . . . Nonetheless, in evaluating claims of impropriety during summation, we recognize that the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 778, 155 A.3d 188 (2017).

Finally, we note that although the defendant objected to only one comment by the prosecutor, we will review his claims of prosecutorial misconduct. "It is well established law . . . that a defendant who fails to preserve

claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Our Supreme Court has explained that the defendant's failure to object at trial to . . . the [occurrence] that he now raises as [an instance] of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his [claim]. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Fernandez*, 169 Conn. App. 855, 867–68, 153 A.3d 53 (2016). Guided by these principles, we consider each of the defendant's claims of prosecutorial impropriety in turn.

A

The defendant first argues that an impropriety occurred when the prosecutor misstated to the jury during closing arguments that Maringola had testified that two people exited from the Acura, shot at the victim, walked closer to the T-Rex and fired a second volley of gunshots at the victim. We conclude that even if the challenged statement constituted an impropriety, the defendant failed to meet his burden of showing that it violated his right to due process.

As part of his preliminary remarks to the jury during closing argument, the prosecutor noted that if he said something about the facts of the case that was different from what a member of the jury remembered, then "your memory prevails, not what I have said." During the course of his presentation, the prosecutor argued the following to the jury: "Now, you heard testimony from Adam Maringola, remember Adam Maringola, he was in the home on Hanover . . . he was cleaning the house, he was preparing to move in. At that point, he heard the T-Rex, T-Rex drives down Hanover Street, caught his attention, he looked out the window. Saw it pull into the driveway at the end of Hanover and the T intersection with Boyden Street. He saw a number of people get out of the car, not exactly sure how many. But he saw two of them exit the black Acura and walk toward that T-Rex, parked in the driveway. At that time, he sees the T-Rex back out, sees the two guys shoot. As he testified, he's shooting at the left side of the car, same side as [the victim] was struck with [a] number of bullets. *The bike crashes. He saw two people walk up to the bike*, he heard somebody say to [the victim], get out of the bike. He then heard [the victim] say, I

can't. More shots." (Emphasis added.)

Maringola, the first witness of the trial, testified that he had observed two or three individuals exit the Acura while the T-Rex was in the driveway. He then saw that "two people [were] walking toward the bike." When the T-Rex started to back out of the driveway, the two individuals began shooting. The T-Rex crashed and came to a stop, and the passenger jumped out and ran away. The two men from the Acura shot at the passenger. Maringola then stated that, at this point, someone went up to the T-Rex, but he was not sure whether it was just one of the individuals from the Acura or both, and instructed the driver of the T-Rex to "get out." Finally, the person who had ordered the victim to "get out" shot the victim multiple times. During cross-examination, however, Maringola agreed with defense counsel's statement that it was "two people that walked up to the bike . . . ." A review of the colloquy between Maringola and defense counsel leads to the conclusion that Maringola was referencing a time frame from when the two individuals exited the Acura, but before they started shooting for the first time.

We have recognized that "[p]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . [B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Williams*, 172 Conn. App. 820, 834, A.3d , cert. denied, 326 Conn. 913, A.3d (2017); see also *State* v. *Bennett*, supra, 324 Conn. 778; *State* v. *Williams*, 102 Conn. App. 168, 193–94, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

This latitude does not, however, permit a prosecutor to state, comment upon, or suggest an inference from facts not in evidence or present matters that the jury has no right to consider. *State* v. *Otto*, supra, 305 Conn. 76–77; *State* v. *Patterson*, 170 Conn. App. 768, 789, 156 A.3d 66, cert. denied, 325 Conn. 910, 158 A.3d 320 (2017); see also *State* v. *Ross*, 151 Conn. App. 687, 697–98, 95 A.3d 1208 (when prosecutor suggests fact not in evidence, there is risk that jury may conclude that he had independent knowledge of facts that could not be presented to jury), cert. denied, 314 Conn. 926, 101 A.3d 271, 272 (2014).

In the present case, the prosecutor incorrectly argued to the jury that Maringola had testified that two men approached the T-Rex after it crashed following the initial volley of gunshots. A review of his testimony

reveals that Maringola did not make such a statement, either during direct examination or cross-examination. Although this mistake does not appear to have been made intentionally, the prosecutor did not include any type of qualifier with respect to Maringola's testimony. See, e.g., *State* v. *Rios*, supra, 171 Conn. App. 59 (use of phrase " 'something like that' " made it clear prosecutor was not attempting to mislead jury into believing those were precise words of defendant and mitigated impact of imprecision of words used); cf. *State* v. *Patterson*, supra, 170 Conn. App. 793 (prosecutor did not request that jury make reasonable inference but mischaracterized identification testimony of witness); *State* v. *Sargent*, 87 Conn. App. 24, 39–40, 864 A.2d 20 (improper for prosecutor to convey that he was recounting actual testimony of witness and then mischaracterize it during closing argument), cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005).

Assuming, without deciding, that the prosecutor's comment that two men approaching the T-Rex after it had crashed constituted prosecutorial impropriety, we nevertheless conclude that this comment did not deprive the defendant of his right to a fair trial. This conclusion is based on our consideration of the *Williams* factors. The defendant did not invite the challenged comment and thus the first factor weighs in his favor. The second factor, the severity of the impropriety, weighs in favor of the state because the defendant failed to object at the time of the comment. "[W]e consider it highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial. Defense counsel, therefore, presumably [did] not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . Given the defendant's failure to object, only instances of grossly egregious [impropriety] will be severe enough to mandate reversal." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 170 Conn. App. 797–98. Further, this relatively minor misstatement by the prosecutor does not rise to the level of a grossly egregious impropriety. Id., 798.

The third factor, the frequency of the comment, also weighs in favor of the state. The prosecutor's comment regarding Maringola's testimony was a small part of his summation of the evidence against the defendant and did not constitute the main theme that consistently was emphasized during closing argument. We also iterate that counsel is afforded generous latitude during closing argument. See *State* v. *Williams*, supra, 172 Conn. App. 834. The fourth factor, whether the impropriety related to a critical issue in the case, also favors the state. While a significant issue during the trial was whether the defendant was one of the individuals who exited the Acura and shot at the T-Rex, the question of whether one or both approached the T-Rex after it had crashed

was not significant to that determination. Once the jury had determined that the defendant was one of the two persons from the Acura and participated in the shooting, it had resolved the question of identity and the specifics of who approached the T-Rex after the crash was negligible.

The fifth factor, whether the court provided a curative instruction, favors the state. A request to disregard the incorrect statement of the prosecutor was not made by the defendant, and therefore the court did not provide such an instruction. It did, however, instruct the members of the jury that they were the "sole judges of the facts" and that they were to "recollect and weigh the evidence, and form [their] own conclusions as to what the ultimate facts are." The court also stated that jury's recollection of the facts prevailed because it was the exclusive trier of fact. The sixth factor, the strength of the state's case, also weighs in favor of the state. A great deal of circumstantial evidence placed the defendant at the scene of the crime, linked him to one of the firearms used and provided consciousness of guilt. The testimony of Habib, which the jury was free to credit despite his status as a jailhouse informant, directly identified the defendant as one of the shooters.

After a consideration of the *Williams* factors, we conclude that the prosecutor's statement regarding two men approaching the T-Rex after it had crashed, even if improper, did not deny the defendant of his due process right to a fair trial.

B

The defendant next argues that an impropriety occurred when the prosecutor misstated Habib's testimony regarding the defendant's inculpatory statements in the New Haven Correctional Center. We again conclude that the defendant failed to establish that his right to due process was violated.

The following additional facts are necessary for our discussion. During his closing argument, the prosecutor stated: "[O]nly two people have the guns. How do we know it's the defendant? His own words. Eight months, nine months later when he was in jail, he told Mr. Habib, *I only took the fool's chain.* Two people walked up that bike, two people had guns, two people walked back to the car, he had to be one of them, he took the chain; that's what he said. . . . Now, you'll find in the charge that the defendant's charged as a principal and an accessory to murder. The principal's a person who actually commits the act; accessory is one who aids or helps another person in that act. Again, you're gonna say, how do we know he's the shooter? *Again, by his own words. . . . We also know by his own words that he killed* [*the victim*]. *He stated to Joshua Habib that he killed* [*the victim*]." (Emphasis added.)

The prosecutor used similar language during his clos-

ing argument addressing the charge of felony murder. "Once again, we know the defendant was in possession of the gun at—on [July 8] because . . . two people walked out of that car with guns, two people walked up to the bike, two people shot . . . . *His own words, I took the fool's chain.* How would he take the fool's chain if he didn't walk up to that bike? It has to be one of the two people. And again, if he is, there are only two people shooting, he's one of the two people shooting." (Emphasis added.)

The defendant also challenges the remarks made near the conclusion of the closing argument where the prosecutor stated: "We also know that the defendant killed [the victim] because he told Mr. Habib—he told Mr. Habib that a person that he was with when he killed a guy talked to the police and gave a statement." Finally, the defendant points to the following statement during the prosecutor's rebuttal argument: "Now, let's talk about [Habib] for a few minutes. He [testified]—this guy right here told him the reason he got . . . arrested—let me change that—somebody he was with, when he killed the guy in Waterbury, he got arrested down South."

The defendant has raised two distinct claims of prosecutorial impropriety with respect to these excerpts from the closing arguments. First, he contends that the prosecutor improperly interpreted Habib's testimony as to contain a direct admission by the defendant that he shot the victim in Waterbury. As we set forth in part I A 1 of this opinion, Habib testified that the defendant had stated that "*he* got out of the car and shot him, and they were attempting or he—intentions was to rob him for the [T-Rex] . . . . His intentions were to rob the—the victim of the [T-Rex] he was riding and whatever else he may have had on him, but they ultimately just ended up taking his chain . . . ." The prosecutor's arguments to the jury that the defendant had directly admitted to shooting the victim and taking the chain were based on evidence. Therefore, the comments made by the prosecutor that Habib's testimony included a direct admission by the defendant were not improper. See *State* v. *Taft*, supra, 306 Conn. 767.

The defendant's second claim of prosecutorial impropriety with respect to the excerpts cited is that the prosecutor improperly argued that the defendant directly had admitted to taking "the fool's chain." We note that the phrase, "the fool's chain," was not part of the evidence in this case; no person testified that the defendant had used that phrase. Further, contrary to the prosecutor's argument, Habib did not testify that the defendant had used the pronoun "I" rather than "they" with respect to describing who had taken the victim's chain. Therefore, for the reasons stated in part III A, we will assume, without deciding, that portion of the prosecutor's argument to the jury constituted an impropriety and proceed to the *Williams* factors.

As for the first *Williams* factor, we conclude that the comments regarding the chain were not invited, and therefore this factor weighs in favor of the defendant. The second factor weighs in favor of the state, as it was not severe. The defendant did not object, and the prosecutor's comments did not rise to the level of grossly egregious impropriety. See *State* v. *Patterson*, supra, 170 Conn. App. 798. The third factor, the frequency of the comments, favors the state. The fourth factor, whether the comment went to a central issue, also favors the state. These comments at issue constitute cumulative evidence as to the issue of identity. Finally, the fifth and sixth factors weigh in favor of the state for the reasons set forth in part III A of this opinion. Accordingly, we conclude that the defendant has failed to establish that his right to due process was violated as a result of any misstatements as to Habib's testimony.

C

The defendant finally argues that the prosecutor's misstatement during closing argument that the defendant had Isis Hargrove's phone constituted prosecutorial impropriety. Specifically, he contends that this statement was an improper comment on facts not in evidence. The state counters that this comment was a fair argument because it was based on a reasonable inference from the facts presented at the trial. We agree with the state.

During his rebuttal argument to the jury, the prosecutor stated: "Now, Shaina Moye—excuse me—she said—she testified that this defendant the entire night driving all the way from New Haven to Waterbury [had] Isis Hargrove's phone . . . . All the way up, all the way driving around Waterbury. Now, you remember 12:17 a.m. on July 8th, all three phones, Shaina Moye's, Earl Simpson's and Isis Hargrove's hit off the Waterbury tower for the first time. From that point until about 1:32 a.m., there are eighteen telephone calls from Shaina Moye's phone and Isis Hargrove's phone. They're not sitting next to each other in the front seat of the car calling each other, are they? No. He had Isis Hargrove's phone . . . ." At this point, defense counsel objected on the ground that there was no evidence that anyone had that phone. The prosecutor responded that his comments were based on Moye's testimony. The court allowed the argument as a comment on the evidence. The prosecutor then continued: "He had her phone. And the calls are going back and forth to the two cars; eighteen phone calls in that time frame."

Moye testified that she was a friend of Hargrove, who drove a black Acura in July, 2011. On July 7, 2011, Moye went to Waterbury to celebrate the defendant's birthday. Moye, accompanied by another woman, drove her tan Chevrolet Malibu to a gas station to meet up with the defendant, Simpson, Hargrove and another

man. The three women, driving in the Malibu, followed the men, driving the Acura, to Waterbury. After picking up a friend of the defendant, the group went to a nightclub. When the nightclub closed, the three women went to a fast food restaurant in the Malibu, and she saw the four men leave in the Acura. Moye stated that Hargrove called the defendant, and Moye overheard the defendant state "we just did some hot shit." The Acura then arrived at the restaurant. Hargrove and the defendant switched cars, ending up in the Acura and Malibu respectively. Both cars then left the restaurant, even though the women had ordered and paid for their food, but not yet received it. Moye followed Hargrove back to New Haven. During cross-examination, Moye stated that Hargrove had been using her phone that night.

The state also presented the testimony of Norman Ray Clark, a custodian of records employed by Sprint Nextel. He stated that there were sixteen phone calls between Moye's phone and Hargrove's phone between 11:54 p.m. on July 7, 2011, and 2:06 a.m. on July 8, 2011, and that cell tower information placed Hargrove's phone in Waterbury for nearly all of these calls.

The state presented evidence, therefore, that Hargrove spoke with the defendant during the time of the Waterbury shooting, and shortly thereafter. Additionally, there was evidence that Hargrove used Moye's phone, and thus it was likely that the defendant used Hargrove's phone. This inference is supported by Moye's testimony that she overhead the conversation between the defendant and Hargrove while Hargrove used Moye's phone, and the phone records detailing the phone calls between Hargrove's phone and Moye's phone during the relevant time periods. Cell phone towers confirmed that both of these phones were in the same area at the relevant time supports this scenario. In short, the prosecutor's argument that the defendant had used Hargrove's phone was based on the evidence and therefore did not constitute prosecutorial impropriety. See *State* v. *Taft*, supra, 306 Conn. 767.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury also found the defendant guilty of felony murder in violation of General Statutes § 53a-54c. The trial court initially rendered judgment of conviction in accordance with the jury's verdict as to the felony murder count. After sentencing, the court vacated the conviction of felony murder, citing to our decision in *State* v. *Miranda*, 145 Conn. App. 494, 508, 75 A.3d 742 (2013), aff'd, 317 Conn. 741, 120 A.3d 490 (2015), in which this court stated: "Our Supreme Court, however, has specifically concluded that the legislature intended that intentional murder and felony murder are alternative means of committing the same offense and should be treated as a single crime for double jeopardy purposes. . . . Because . . . felony murder and intentional murder are the same offense for double jeopardy purposes . . . the vacatur remedy adopted in [*State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013)] must apply." (Citations omitted; internal quotation marks omitted.)

[2] Adam Maringola, a witness to the incident, described the T-Rex as a "custom vehicle" with two wheels in the front and one wheel in the back, and having two car seats.

[3] Susan Williams, a pathologist with the state's chief medical examiner's

office, who conducted the autopsy of the victim, concluded that the victim died as a result of suffering multiple gunshot wounds.

[4] We note that the defendant was convicted of murder, felony murder, robbery or attempt to commit robbery in the first degree, carrying a pistol without a permit and criminal possession of a pistol or revolver as a result of this incident. See *State* v. *Franklin*, 162 Conn. App. 78, 81–82, 129 A.3d 770 (2015), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016). The jury in the present case was unaware of these charges and the defendant's conviction.

[5] Juengst also explained the difference between a casing and a projectile: "Well, if you were to take a complete bullet, it consists of a projectile, which is what we normally associate with a bullet. It's usually a metal slug. Oftentimes, it may contain a jacket which is copper that covers or partially covers that slug, and the casing is what contains the gunpowder, the primer, and is capped off by the bullet." Juengst further indicated the method by which shell casings are left behind at the scene of a shooting. "[A] semiautomatic handgun will eject a casing after the gun has been fired and the bullet [has] left the casing through the chamber of the gun and eject the casing out of the gun. Whereas, with a revolver, if you were to fire a revolver, it would leave the casing insider the chamber of the revolver. It could be, of course, manually removed by the shooter and left behind at the scene. But those are the only two ways that a casing or a spent casing can be left behind at the scene of a shooting."

[6] James Stephenson, a state firearms and tool mark examiner, testified that two guns had fired all of the bullets at the Waterbury and New Haven locations.

[7] At the time he was arrested and taken into custody, the defendant possessed an identification card that listed a false name. When presented with documents containing his true name and photograph, the defendant "sighed heavily . . . dropped his head and nodded."

[8] See footnote 1 of this opinion.

[9] We begin with this claim because if the defendant prevails on the sufficiency claim, he is entitled to a directed judgment of acquittal on these charges, rather than to a new trial. See *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 564 (2007); see also *State* v. *Badaracco*, 156 Conn. App. 650, 656 n.11, 114 A.3d 507 (2015).

[10] "Even if this claim had not been preserved, we would review it on appeal. Our Supreme Court has observed that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]. . . . Accordingly, because there is no practical significance . . . for engaging in a *Golding* analysis, we review an unpreserved sufficiency of the evidence claim as though it had been preserved. . . . *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied,      U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015)." (Internal quotation marks omitted.) *State* v. *Terry*, 161 Conn. App. 797, 804 n.4, 128 A.3d 958 (2015), cert. denied, 320 Conn. 916, 131 A.3d 751 (2016).

[11] See Practice Book § 42-51.

[12] General Statutes § 53a-54a provides: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[13] Our Supreme Court has stated that "consistent with well established underlying principles of accessorial liability, the state must prove that [a] defendant acted as an accessory by soliciting, requesting, commanding, importuning or intentionally aiding . . . in causing [a] victim's death. . . . This is because accessorial liability is designed to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one

who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate or consummate it." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 311 Conn. 408, 421, 87 A.3d 1101 (2014); see also General Statutes § 53a-8 (a).

We also note that the state did not charge the defendant with conspiracy to commit murder, and therefore did not attempt to convict the defendant under the *Pinkerton* doctrine. See *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). "[U]nder the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did not commit if the state can establish that a coconspirator did commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy." (Internal quotation marks omitted.) *State* v. *VanDeusen*, 160 Conn. App. 815, 845, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015).

[14] Habib met the definition of a jailhouse informant because he was incarcerated at the time of his testimony at the defendant's trial and his testimony was about a crime that he had not witnessed personally, but a confession or inculpatory statements made by the defendant during their incarceration. See *State* v. *Diaz*, 302 Conn. 93, 102–104, 25 A.3d 594 (2011); see also *State* v. *Arroyo*, 292 Conn. 558, 564–70, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); *State* v. *Patterson*, 276 Conn. 452, 465, 886 A.2d 777 (2005); cf. *State* v. *Carattini*, 142 Conn. App. 516, 523–24, 73 A.3d 733 (witness was not jailhouse informant because he was not incarcerated at time of testimony and did not testify about confession or inculpatory statements made at time when both were incarcerated together), cert. denied, 309 Conn. 912, 69 A.3d 308 (2013).

Our Supreme Court has noted that "[t]estimony by a jailhouse informant about a jailhouse confession is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence. . . . In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 302 Conn. 93, 109–10, 25 A.3d 594 (2011). Nevertheless, the jury, properly instructed on informant testimony, remained free to accept and credit Habib's testimony, despite his status as a jailhouse informant.

[15] During its deliberations, the jury requested to rehear Habib's testimony.

[16] The state set forth four acts of uncharged misconduct that it might seek to have admitted into evidence. The first act was that in June, 2011, the defendant possessed a firearm and threatened another person. The second act was that the day after the Waterbury shooting, the defendant shot and killed another victim in New Haven and that Simpson and the defendant were present at both crime scenes. The third act was that after the Waterbury and New Haven shootings, the defendant fled Connecticut and was subject to a traffic stop by a New Jersey state police officer. During this stop, the defendant provided the officer with a false name, and there were guns in the trunk of the automobile. The fourth act was that he possessed an identification card containing his picture and a different name at the time of his arrest.

For the limited purpose of demonstrating the defendant's consciousness of guilt, the court permitted the state to present evidence that the defendant had fled from Connecticut and had provided law enforcement in New Jersey with a false name. The defendant has not challenged that ruling in this appeal. The court also determined that the state could present evidence regarding the defendant's discharge of a firearm on the day following the Waterbury shooting, but not that he shot at a person. The court granted the motion in limine with respect to the first act of uncharged misconduct. Thus, we will not discuss in further detail the first, third and fourth alleged acts set forth in the state's pleading regarding uncharged misconduct.

[17] Specifically, the court stated: "Mr. Lofton, I want to go over something with you that's very important. As far as any testimony involving a homicide, somebody was actually shot at in New Haven, that's not any area that you can talk about. You can talk about the fact that you—what you saw, but that's it. Is that clear?"

[18] Section 4-5 (b) of the 2009 edition of the Connecticut Code of Evidence provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection

(a) such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.''

[19] To the extent that the defendant summarily claims that there was no probative value to the fact that Lofton observed the defendant discharging the firearm, and all that was necessary was that he "saw the defendant with a silver handgun and that [Lofton] heard gunshots," we disagree. The discharge of the gun by the defendant on July 9, 2011, directly connected the defendant to the Waterbury shooting and showed that he had the means to commit those crimes. See *State* v. *Blango*, 103 Conn. App. 100, 110, 927 A.2d 964, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007); see also *State* v. *Stevenson*, 53 Conn. App. 551, 571–72, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999); *State* v. *Sivri*, 46 Conn. App. 578, 584, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997).

[20] The defendant appears to agree that the admission into evidence of the collection of the bullets and casings from the New Haven crime scene and the matching of those items found in Waterbury the night before did not constitute an abuse of discretion.

[21] "Our Supreme Court has identified four factors relevant to determining whether the admission of otherwise probative evidence is unduly prejudicial. These are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it. . . . *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013)." (Internal quotation marks omitted.) *State* v. *Toro*, 172 Conn. App. 810, 816,      A.3d      (2017). The defendant's appellate argument pertains only to the first factor regarding the issue of undue prejudice; therefore, we confine our analysis and discussion accordingly.

―――――――――――――――――――